The United States Court of Appeals for the Eleventh-Third is now in accordance with law. God bless the United States and its Honorable Court. Good afternoon. Please be seated. We have one case this afternoon, number 22-12331, Andrew Allred v. Secretary of the Florida Department of Corrections. We have Ms. Henry here for Mr. Allred, and we have Mr. Bopec here for the Secretary. You know the lighting system, when the yellow light goes on, that means that your time is starting to run out, so you can start wrapping up. If we take you beyond the red light, then don't worry about it. You'll be on our time and not yours. Ms. Henry, whenever you're ready. Good afternoon, and may it please the Court. My name is Tracy Henry, and I represent Andrew Allred in this appeal. We're before the Court on the denial of a 2254 petition for writ of habeas corpus, and this Court issued a certificate of appealability on the narrow issue of whether trial counsel was ineffective under Strickland for failing to conduct a sufficient background investigation and to ensure a reasonably competent mental health evaluation during the penalty phase. Mr. Allred's trial counsel were deficient in the representation and not acting as the counsel that's guaranteed to Mr. Allred under the Sixth Amendment because they failed to present any mental health mitigation at all. In a highly aggravated case where the client confessed to police moments after the crime, pled guilty to all charges without any negotiation that could have taken the death penalty off the table and then waived a jury for penalty phase. Can I ask you, so I don't want to interrupt you during the sequence of your argument, but I have a couple of factual questions for you. Yes, sir. And I'll ask Mr. Bobeck the same to make sure we're all on the same page. With regards to Dr. Danziger. Yes, sir. He was initially a retained defense expert, is that right? Yes. Oh, yes, I'm sorry. Yes, he was retained by the defense. By the defense at trial, correct. Okay. Now, the Florida Supreme Court's opinion and the briefs are a little bit confusing to me because they say that he was initially retained to provide an opinion on the issue of insanity. But then they say that he ultimately found Mr. Allred to be competent. And those two mental states, although they overlap, are not necessarily one and the same and have different standards. So I'd like to know what he was initially retained for. Maybe he was retained for something else as the trial drew nearer and what his two opinions were or one opinion was. With Dr. Danziger, trial counsel initially retained him almost immediately after the arrest. There was a little conflict in the evidence at the evidentiary hearing as to exactly what he was hired for. Tim Caudell, trial counsel, believed that he remembered that Dr. Danziger was hired to determine whether Mr. Allred was competent to proceed. Dr. Danziger testified that he was hired to determine whether an insanity defense could be raised and that he himself determined that there was no insanity defense. Got it. So as far as Dr. Danziger is concerned, he was there to evaluate for insanity. He got a call from Tim Caudell. He did the evaluation. He called Tim Caudell back and said, you don't have an insanity defense. And then that was the end of his involvement in the case as far as the trial goes. So he was not asked to render, according to Dr. Danziger's testimony, he was not asked to render an opinion on legal competency? No. No, just insanity. Just insanity. Okay. And to clarify further, he was also not retained at any point to develop any mitigation evidence as well. Got it. Got it. Okay. And then the other factual question I have is this. With regards to Dr. Day, the record seems to indicate and the post-conviction court, the state trial post-conviction court found that Mr. Caudell had sort of stopped things a little bit too prematurely because Dr. Day had not reached a final decision with regard to Mr. Allred's diagnosis. So my question to you is this. Did Dr. Day testify as to what her ultimate diagnosis would have been had she been told to continue and finish? No. Dr. Day testified at the evidentiary hearing. I can give you her words. She did not reach a final diagnosis. What she said was that there were discussions that they had. Right, but why did she not reach? I understand that Mr. Caudell may have stopped his part of the process prematurely, but why did she not reach a final diagnosis at some point? No one really ever asked her. There's no indication in the records that I have seen that she ever offered a diagnosis, and there's no indication in the records that I have seen that she was ever asked for a diagnosis. Didn't she say, and correct me if I'm wrong, but I thought that she said that he was missing everything but one thing for antisocial personality disorder. That's actually incorrect. Okay. What she said was that he met some of the criteria. With the specific criteria that he didn't meet being that these things didn't develop when he was a child? That was one of the ones that she said, and that's the thing. People seem to have gotten fixated on the lack of conduct disorder before the age of 15, but what Dr. Day said was that he also had some of the interpersonal issues, some of the behavioral component, but the problem with all of whatever she may have seen, and we don't have her records, we don't have her notes, but what she testified to at the evidentiary hearing on page 358, he had interpersonal difficulties engaged obviously in conduct that were rule violations, but one of the criteria is the pervasive pattern from 15 forward, which is the second part of that, is that first you have to have the onset of the antisocial activities prior to age 15, but then it has to continue into adulthood, and that's one of the things she wasn't finding. But she said, what I have were more recent of the last couple of years, difficulties of societal norms, some deceitfulness, the impulsivity or failure to plan ahead. He had reverence disregard for the safety of others, but she's talking about all of this in terms of the crime itself. He was 21. Was he 21 when he committed the crime? He was 21. Okay. So I mean, I guess, you know, one thing with reviewing cases like this, you know, it has to onset before the age of 15, but he's 21 when he commits the crime, so he's still very young in any way. I kind of understood from what I was reading from Day that she just didn't have a diagnosis, that there just wasn't really anything to offer. What do you say about that? No, I disagree with you. Okay. That's part of the problem here is that Dr. Day never came to a diagnosis at trial. Trial counsel never followed up with her with whatever it was that she may or may not have said to them in passing two weeks prior to penalty phase that drove them to write that one memo that's been discussed in the briefing. I guess my read on that, which maybe I'm just looking at it the wrong way, but my read on that was not that she didn't get pressed to provide a diagnosis. It was that she did an examination and there was no diagnosis to provide. Right? So, I mean, if I talk to a psychiatrist, they don't have to diagnose me with anything. They could just say, like, there's nothing, you know, you're crazy but not diagnosable, right? I mean, so what about that? Well, what she did say, she said that he had some features, but there wasn't really anything in particular that she could diagnose him with at that time. But she really only, her two colleagues had gone to see Mr. Allred pretty much right away. They did the MMPI, they did the Waze, and they did a couple of other tests. She herself spoke with Mr. Allred twice and his parents once. At that time, as everyone has testified to, Mr. Allred was pretty closed off. He was not giving a lot, so she did what she could with what she had, but there really wasn't any, she never came to any final diagnosis, and to date, she has never come to a final diagnosis. Is there any evidence that what she would have to say would have been favorable if she hadn't been allowed to continue or if she had been called to testify? There's really no evidence of anything that could have been good. What she told Mr. Caudill, what she remembers telling Mr. Caudill, is that... Caudill was the lawyer, right? No, no, no, I just did a lot of names, I just want to make sure, okay. What she had told him was that whatever she had that could have been mitigating, if there was anything, she probably could have, but maybe, but if she had been cross-examined on aggravators, she would actually have to testify about things that she found that was potentially aggravating. Part of the danger in a case like this is that if the defense wanted to call Dr. Day, they would have had to turn over her report, and the report would have contained a fair amount of negative stuff, although no definite diagnosis with regard to the antisocial personality disorder. Yes, but what it also would have contained, or what it should have contained, and what trial counsel should have done, is once you get this information from your expert, then you have to interrogate that information. Okay, he's got antisocial features. What are they? How do they affect him? What does this mean in the grand scheme of things as it relates to this crime? Okay, maybe he scores high on the MMPI on the, what's it called, psychopathic indicator or something like that. Well, what are the questions? A trial counsel never did anything other than he may have heard her use the word antisocial features, and then he just dropped it and ran. And instead of saying, and even in his testimony, he said that if a mental health expert told me something that I didn't like or that I was unsure of, something like antisocial, my next question would be, are you sure? What does this mean? And he didn't remember doing this with her, and nothing in her records or any of the records indicates that he ever did that. How do we factor in if we credit Dr. Danziger's testimony that Mr. Caudill had Dr. Day's unfinished diagnosis with some negative information and some negative features, as she put it, and you had Dr. Danziger saying that there wasn't a valid basis for an insanity defense? When you put those two things together, how does that bear on Mr. Caudill's performance? When you put those two things together, and again, I go back to Dr. Danziger, I mean, basically all he did was go in and talk to the guy for a couple hours and say, well, he's not crazy enough for an insanity defense. He didn't do any in-depth studies. He didn't do any testing. And unfortunately, Dr. Danziger's records of that testing have been destroyed accidentally when they were doing a records purge. So we have nothing other than Dr. Danziger's memory of this. What's interesting about the interplay between Dr. Danziger and Dr. Day, and I can take this to the evidentiary hearing, where Dr. Day is testifying about that no, Mr. Allred didn't meet any of the criteria, or not all of the criteria for ASPD. Drs. Caddy and Gefkin testified that he didn't meet any of them. And Dr. Danziger testified that he also didn't meet, he met almost none of them. And the Florida Supreme Court, well, the post-conviction court and the Florida Supreme Court used Dr. Danziger's opinions to discount what Drs. Gefkin and Caddy were saying, as far as other diagnoses, and we're not going to go into those. But what they didn't do when they were determining, like the Florida Supreme Court said he had all but one of the indicators for ASPD. Dr. Danziger didn't testify to that. In fact, he testified that he didn't have most of the indicators. And yet, while the Florida Supreme Court and the post-conviction court are using Dr. Danziger's testimony to discount the defense experts, they weren't giving him that same deference in relation to Dr. Day's opinion. The Florida Supreme Court opinion is based largely on what Dr. Day testified to at the evidentiary hearing, and they completely ignored the fact that Dr. Danziger disagreed with her, as far as what the diagnosis was and whether he was ever going to be able to be diagnosed with ASPD. He said that Allred is not ASPD. He is not a sociopath. He is not a psychopath. He doesn't fit any of the commonly accepted definitions for those terms. Okay, so let's, for purposes of this question, I assume that you're right and that we can knock out the antisocial personality disorder diagnosis. You still have to look for favorable mitigating evidence that would have somehow altered the balance, right, under Strickland for purposes of prejudice. Where does that come from? Where does the mitigating evidence come from? Yeah, particularly in light of what the state post-conviction court said with regard to credibility and weight. True. And to go back to when Dr. Day was initially retained, and this was in, I want to say, October of 2007. Her colleagues tested Mr. Allred. She once tested Mr. Allred. And they were done. They had wrapped up most of what their mental health mitigation work would have been around December 07, January 08, and then they stopped working. Around March of 08, the public defender's office called Dr. Day's office and said, we've heard from the deputies that Mr. Allred is decompensating. Can you please send someone in to see if he is still competent? And so her office sent someone in, and he went and found that Mr. Allred's depression, he was very high, he had severe depression. And then the next day, Dr. Day's office sent the public defender's office a memo saying, we saw him, he's competent, he's very depressed, this is the end of our work. And then he never, in all of that time, he never asked for anything like, well, you've seen him, you've tested him, what do you think? What do you know? And at this point, we're six months out from penalty phase. And nothing has been developed. Nothing has been discussed, and nothing has happened. And then two weeks prior to penalty phase, Dr. Day's notes reflect that it was a phone call, Mr. Caudill testified that he thought that they saw each other in passing in the jail parking lot, which is apparently something that happens a lot. And that was when they had some kind of conversation where the words antisocial or psychopathic may have been exchanged. And that was the entire basis for trial counsel to drop completely the mental health mitigation in a highly aggravated case where there is absolutely no doubt as to guilt. So here's what I think this is the Florida Supreme Court said about what Dr. Day said to trial counsel. This is a quote from the, I think this is the Florida Supreme Court, that Dr. Day said that, quote,  of what the victim's family was experiencing, end quote. Is that, do you disagree with that? I do not. Okay. And that was from this, like, phone conversation slash parking lot conversation. No one really remembers exactly what it was. Okay. Yes, and one of the aspects that we have to remember here is that Mr. Allred waived a penalty phase charge. This penalty phase was done in front of Judge Eaton. Right. And if we're all familiar with Judge Eaton, he is the judge in Florida who teaches all of the other judges how to handle death penalty cases. If there was ever a judge who was going to understand how to balance the good and the bad, it was Judge Eaton. He would know. And the thing is that at penalty phase, he did see. He saw the confession video, and he saw how Allred was. He saw how he was acting, and he saw how he was talking. And what people are bringing, what Dr. Day and trial counsel were bringing up is that, well, we can't put this in front of the judge or we can't put this in front of the sentencer because then all of the other bad stuff will come in. The thing is that all of the bad stuff did come in. It came in anyway. Judge Eaton, they were worried about the sentencer using lack of remorse and the attitude as kind of a non-statutory aggravator, but the thing is that this is Judge Eaton. He knows not to use it as a non-statutory aggravator. He saw the video. He actually commented on it in the sentencing order, but not in the aggravators. He used it to discount the extreme emotional distress mitigator. So he saw it. He was affected by it. He knew that that lack of remorse was there. So keeping anything Dr. Day, dropping mental health completely just because they didn't want Dr. Day to testify about whether or not Allred was remorseful, it was already out there. Everybody already knew it. But it's more than just not being remorseful, right? Because without a diagnosis, Dr. Day would have said some negative things about Mr. Allred, things that went beyond the lack of remorse and the videotaped deposition. Yes. So what's the mitigating evidence that counters that? Because the most you can do, I think, this is only for me, I think the most you can do with Dr. Day is explain that she was sort of a wash. But she doesn't have anything really good or favorable to say about him, so that evidence has to come in from somewhere else, which leaves the other two doctors. But the state post-conviction court found them less credible and it gave them less weight. So how do we deal with that? Well, we deal with that by going back to trial again because Mr. Cardell had the opportunity to find any mental health mitigation because he had the opportunity. He had six months. At the time when Dr. Day told him that they were stopping work, he should have said, what do you have? What do you think? What do you know? What can I use? Do you have anything I can use? And that was something that he said that he did all of the time. And if she had said to him then, I don't think I can help you. I don't know if I have anything mitigating. Then you've got six months. Go back to Dr. Danzinger, who has already seen your client, and ask him what he thinks. We're not talking about trying to find – we're not talking about expert shopping here because one of the things that trial counsel didn't do was work with the expert that they actually had. They never got an opinion. They never got a diagnosis. Working with experts is like working with computers. You only get out what you put in. You have to give them the program. You have to ask for the information. Otherwise, you're just getting garbage. Well, that might get you deficient performance, but how do you get prejudice then? Because we don't really know what they would have said. We really don't know what Dr. Danzinger would have said or what Dr. Day would have said. We don't, and that is a problem. But all of this should have been presented to Judge Eaton because of this failure and because of this lack of information, Judge Eaton, who was the sentencer, wasn't in position of all of the information that he needed to weigh the aggravators and all of the available mitigation. That's part of the problem is that Judge Eaton never saw or heard all of the available mitigation, and that renders the sentence unreliable. Well, let's talk about some of the potentially mitigating evidence that was presented at the state post-conviction hearing. I may have the two experts mixed up, but I think it was Dr. Caddy who testified about the disassociative state, right? Right. But there's a portion of his testimony when he says he can't say for sure or opine for sure about whether that state preceded the murders or was caused by the murders. Right. So how do you deal with that sort of ambiguity in his opinion? Well, again, had this information been presented to Judge Eaton, he would have been able to determine whether or not this was credible to him at that time, and he would have been able to weigh it against the information. And I understand that we're here to re-weigh the mitigators and the aggravators. And that's one of the things that kind of happened at evidentiary is that there really continues to be no consensus diagnosis as to what may or may not be wrong with Mr. Allred's brain. But they're all talking about the same person. They're all talking about the same activities. They're all talking about the same symptoms. They're all just using different words. Dr. Caddy talks about a dissociated state. And while he was talking about the dissociated state, he mentioned the fact that Mr. Allred was, after the breakup on his 21st birthday with the victim, he went into what Dr. Caddy called ego disintegration, which is just a Freudian term of he was decompensating. And he didn't have the ability to handle that stressor in his life. And we're talking about Dr. Geffken. Yes, Dr. Geffken attempted an autism diagnosis, and we all know that there is no autism diagnosis there. There wasn't enough to support it. But there is the part of the spectrum, what did he call it, the pervasive developmental disorder. And what Dr. Geffken went on to say is that because of this pervasive developmental disorder, Mr. Allred didn't have the capacity to deal with the stressors in his life. So they're talking about the same thing. It's just never been synthesized into the fact that there was something wrong in there that this breakup triggered, and then he continued to decompensate, and that is what led to the murders. And this is what should have been put in front of Judge Eaton so he could see everything and he could weigh it because he was the sentencer, and this was the information that he needed. Right. I think as Judge Pryor said, that may get you to a conclusion, putting aside ed pediferance for the moment on performance, but you have to show a reasonable probability of a different outcome, even without ed pediferance. And how do you do that given the facts and circumstances of this double murder? It seems that there was ample evidence of premeditation and two cold-blooded murders. There is. And in a situation where there's overwhelming evidence of guilt and the attorney has to know that the penalty phase is the only thing. I mean, at this point, the penalty phase was the only thing, and Mr. Caudill knew that. And the prejudice comes in where if you don't have the mental health mitigation in a case like this where Mr. Caudill himself said that mental health mitigation was the strongest thing that he could have and it was the only thing that would save Mr. Allred from the death penalty, and knowing that and then utterly failing to put that in front of the judge, knowing that that was the only thing that could save his client, that's where the prejudice comes in because the judge didn't have the exact information that he needed to make that balancing act. And I see I'm running out of time, so unless the panel has any other questions. No, you can wrap up and you've saved all of your time for rebuttal. Thank you very much, Ms. Henry. Thank you. Mr. Bobeck. Good afternoon. May it please the Court. My name is Patrick Bobeck and I represent the Secretary in this case. Allred's sole issue on appeal is that trial counsel's decision not to shop around for more favorable experts after the first who he consulted with provided unhelpful opinions amounts to deficient performance. I think it's important to note not just the experience of Timothy Cottle in this case, but his relationship with Dr. Day. He had handled over 100 capital cases. He'd been handling them for over a decade. Twenty-five had gone to trial, and he had worked with Dr. Day many times before. So this is not just the first time he worked with her or some random expert he employed. This was someone whose opinion he knew and trusted from prior occasions. Taking all that as a given, though, it is odd that in a case where your client has pled guilty against your advice, has chosen to waive a jury for the penalty phase, and the lawyer knows that mental health is important, why not wait for a final diagnosis from the expert you've hired to know what you have or you don't have, and then you might be able to ask questions, see if something was missed, engage in some sort of dialogue about what may or may not be there. I'm not saying it's deficient performance, but it seems odd that you wouldn't wait for a report from the one expert you've hired to do mental health work for the sentencing phase. So I think the question is what he did that was actually unreasonable under Strickland. And again, he did have his work relationship with Dr. Day, and if she issues a final report, that can end up being discoverable material. Not if he's not going to call her. Right, but if he goes and finds more experts, which is what they're asking he should have done, they would have asked for her notes, they would have learned. He actually specifically testified that he didn't want other experts to hear that Mr. Allred had ill will toward the victims, that he felt justified. These were things he told Dr. Day and things he already knew about. So I don't think it's objectively unreasonable for him to have not asked for a final report when he knew her and he knew that these things are typically aggravating. And I think most importantly, the way you put it, is that her testimony at best would have been a wash. And it's not unreasonable to not present neutral testimony that is unhelpful and unmitigating. There was also Dr. Danzinger who was employed soon after the arrest. He was the other expert who was consulted. I believe my recollection of the testimony was that he was hired to assess him for an insanity defense. And he found that he wasn't insane at the time and he was competent to proceed. Both unhelpful diagnoses. So he rendered opinions on both issues? He did. He said he was not insane. But we don't have his report in the file. Ms. Henry says that his records were destroyed in an accidental purge. Right. My recollection is from his testimony, the evidentiary hearing, is that he found he was not insane and that he was competent. And he was never found incompetent by Dr. Day either. Or by either of the doctors he talked to in post-conviction. Right, but those two mental states are different, right? In law and in fact. Competence is looking at you now to see whether or not you can appreciate what's going on, what you're charged with, and see if you can assist your counsel. Insanity goes backwards in time to see what your mental state was at the time of the offenses and to see, in general terms, whether you were able to distinguish right from wrong. Right, so those two things are not, they're different. No, I agree. But they're also both unhelpful opinions for defenses or anything. So your recollection is that at the post-conviction hearing, Dr. Danziger testified that he evaluated Mr. Allred for both things? I believe he was evaluating him for insanity, and during the conversation reached the conclusion he was competent. Okay. I don't know if he was employed to do that, but he reached that conclusion. Anyways, I guess, I mean, I don't know what happened, but it does make a little bit of intuitive sense to me that if you're talking to someone right now about whether they were insane at some previous point, you would have to determine some level of competence during that discussion that you have with them, right? I mean, that would be part of it. Yes, Dr. Danziger is a very experienced mental health evaluator. He's been doing this for a long time. So he could be doing both at the same time while evaluating. So I think that brings us to the post-conviction hearing because the big question is what mitigation was provided? And I would argue that there was no extra mitigation provided at the end of the day, no credible mental health expert opinion that could have been used as mitigation against the aggravation in this case. Dr. Caddy said that he had a disassociative state at the time of the murder. This testimony was found not credible by the circuit court, which I think is important to note because that means if it's not credible, it's not mitigating. So we don't have any mitigation from the disassociative state. And that's because, importantly, it didn't fit the facts of the case. He had been threatening to kill the victims for a month beforehand. He armed himself beforehand when he found out where they were. He acted deliberately. There were, I think, eight people at the house. He purposely did not try to shoot anybody else. He only shot one person in the leg when they were restraining him, and then he let that person go. The only people he killed were the people he was there to kill. He then immediately confessed to the police. There's an hour-long interview with him where he is cool, calm, and collected to almost a terrifying degree. He was not out of control. He was not disassociating. He knew exactly what he was doing. He even joked about how he wasn't going to be able to play a video game that he had preordered, how that this had happened. I remember reading that one of the experts said something like that they determined that he was in a disassociated state because he had fragmented memories of the murders at the time he was interviewed by the expert. But this was a collateral review expert. Do you know when that expert would have actually talked to the— Yeah, it was in 2013, six years after the murders. And there are two alternate explanations other than a disassociated state. One is the time passing. Six years had passed, and he's been on death row languishing. And another is that just the mental trauma of committing two murders can themselves cause later fragmented memories of the—and Dr. Caddy testified to that, and Dr. Danziger also testified to that. The other expert was Dr. Gefkin. He diagnosed Mr. Allred with autism spectrum disorder. However, he admitted during his own testimony that Mr. Allred did not meet all the features of autism spectrum disorder, which is the whole reason we're saying he didn't meet antisocial personality disorder. So that's why that testimony was found not credible. You know, how can you say he doesn't meet ASPD when he doesn't meet all the features, but he is autistic when he doesn't meet all the features? And Dr. Danziger testified to that as well. Dr. Gefkin had to concede that he didn't show a need for sameness or the repetitive restrictive behaviors that you see in someone with autism. And so again, since this has not been found credible, it's not mitigating. So in post-conviction, it's impossible to show prejudice because they haven't added any mitigation that the trial court or the floor-of-court or the district court or this court could use in trying to tip the scales between mitigation and aggravation. Given the lack of records which were destroyed, was Dr. Danziger asked at the post-conviction hearing about why it was that he found no basis for an insanity claim? No, he was retained by the state for the post-conviction. Right, and so that was the brunt of his testimony is, do you see any diagnosis in him now? He was a rebuttal against the other diagnoses. So that was really the purpose of his testimony. They didn't get into, you know, why was he not insane at the time. Is it normal in Florida for the state or for the defense to retain somebody else's non-testifying expert for a post-conviction hearing? I don't know if it's totally normal. I have done it in cases. You have somebody who's already familiar with the case. You want to get a second opinion from them, especially if, for example, he never diagnosed him with anything in this case. So he was called to say, okay, do you agree with these diagnoses? So even though he had been a defense expert, he was never a helpful or testifying defense expert. Doesn't that create some sort of a conflict that you're now potentially testifying against a former client? There may or may not, but I'm not sure that's a question that's cognizant in this appeal. I'm not asking about cognizability. I'm just trying to get educated. Sure. It just seems very weird that you hire an expert who doesn't testify, so you're not turning over materials, right? You hire an expert. The expert doesn't reach an opinion you would have liked for him or her to have reached. So you don't call him, but then that means you don't have to disclose the report. And now the other side is retaining him or her in collateral proceedings. That just seems very odd to me. I'm not talking about cognizability for habeas purpose. It just seems very odd that you could do that with their expert or they could do that with your expert, non-testifying experts. I understand the inquiry. I'm not sure it goes to this appeal. That's all I can say. Okay. I'm not an expert on psychological ethical guidelines. But that is what happened in this case. So, again, there's no mitigation, so you don't even have prejudice. So you don't necessarily even have to reach the question of efficiency. But going back to efficiency, we had him rely on not the final diagnosis. And, again, her testimony at the evidentiary hearing was right in line with what he remembers her telling him outside the jail. This is Dr. Day you're talking about? Dr. Day. She had told him she hadn't reached the final diagnosis, but she had to pick one. It would be antisocial personality disorder or that he was a sociopath or a psychopath. At the evidentiary hearing, her testimony wasn't as strong as his recollection. She said he had sociopath, psychopathic features, and he met every feature of ASPD except the onset from 4-15 onward. So he exhibited all the normal symptoms and behaviors of somebody with antisocial personality disorder. He just came to them later in life than you can do to have a formal diagnosis. And if no further questions, I would just ask that you affirm. Thank you. Thank you very much. Whenever you're ready. Just to clarify a couple of points, Dr. Danziger testified at the evidentiary hearing that Mr. Caudill called him, asked to see Mr. Allred shortly after his arrest to see if the criteria for insanity were met. He could not support a finding of insanity and did not see a path to an insanity defense, and he interviewed Allred at the jail. He called Mr. Caudill to say that there was no insanity defense, and that was it. As far as his testimony goes, he did not talk about competency at all. And to continue on with the Dr. Danziger theme, as far as whether Drs. Caddy and Gefkin were found to be credible at the evidentiary hearing, this post-conviction court and the Florida Supreme Court used Dr. Danziger's testimony to determine that they were not credible. At the same time, Dr. Danziger was also disagreeing with Dr. Day's testimony, and yet his testimony was not looked at to make any credibility determination on Dr. Day, despite the fact that he was disagreeing with her just as much as he was disagreeing with the other doctors. I'm confused about that. Could you play that out for me? Maybe I missed something. How did Danziger disagree with Day? He testified that he did not meet any of the criteria for ASPD, that there was no psychopathy, that there was no sociopathy. Oh, and also, Dr. Day never told Mr. Caudill that if she had to give a diagnosis, it would have to be ASPD. She testified to that herself at the evidentiary hearing, that regardless of how many indicators he had, she would never be able to diagnose him with ASPD. Dr. Danziger also testified that, as far as the ASPD is concerned, that there were no pervasiveness of symptoms. What he said was, in Andrew Allred's case, yes, his actions in September of 2007 were horrific, leading to the deaths of two people, but there's not a pattern of ASPD. He committed antisocial acts, but ASPD, the criteria, are not met. So the fact that the state courts are making a credibility determination on the defense's experts based on Dr. Danziger's opinion and determining that they are not credible because of his disagreement with them, but they're determining that Dr. Day is credible despite the fact that Dr. Danziger disagrees with her. They're picking and choosing who's credible based on the same testimony. Well, but, I mean, I understand the argument, but they're testifying about different things. Dr. Danziger's views compared to Dr. Caddy and Dr. Geffen concerns one set of things. Dr. Danziger's testimony about Dr. Day concerns another set of things. And fact finders can treat a witness as credible on X, but not credible on Y. So why is that necessarily a problem? Well, I think it's a problem because they're only determining that the defense witnesses are incredible and not affording that same deference to the state. Well, not the deference, but not... The opposite of deference. Yes. Skepticism, maybe. I feel like there should be equal distribution of credibility here when Dr. Danziger is testifying to all of this. And he did actually examine Mr. Allred during post-conviction. He went to Union Correctional and did examine him then. For what? Well, I think the state sent him out just to kind of see how he was, and Dr. Danziger did come up with a diagnosis at that point, six years later, of adjustment disorder and I believe severe depression or major depressive disorder. But he said that was also situational. He did testify that had he been called at penalty phase, he wouldn't have been able to give a diagnosis. But that makes sense because he never examined Mr. Allred other than in terms of insanity at the time of the crime. So any testimony that he gave saying that he wouldn't have been able to do anything in sentencing is scurrious at best. And again, just to reiterate where the prejudice comes from here is that in the presence of a client who is confessing, pleading guilty, waiving a jury, and putting himself on the mercy of the court, you have to know that the mental health mitigation is the only thing that is going to save your client. The guidelines require that the attorneys or the guidelines suggest that the attorneys put forward all available mitigating evidence in face of this type of evidence. And Mr. Caudill failed to do that, and that is what prejudiced Mr. Allred because the trial court, the sentencer, was unable to balance the aggravators, the strong aggravators, against any kind of strong mental health mitigation. And unless the panel has any additional questions, I would ask that this Court reverse the lower court's decision and remand the directions to Grant. All right, thank you very much. Ms. Henry, if I'm wrong, you can correct me, but I think you and the Office of the Capital Collateral Representative were appointed for Mr. Allred. So on behalf of the Court, I want to thank you and the Office for representing him. We really do appreciate it. And Mr. Bobik, thank you as well too. Okay, we're in recess. Thank you very much. All rise.